# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    v.

**JOSE A. ZUNIGA-LEIJA,**

    **Defendant.**

Case No. 16-CR-20109-JAR

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Jose A. Zuniga-Leija's Motion to Suppress (Doc. 14) a firearm and ammunition seized from the basement of the house where he resided, as well as Defendant's statements made to law enforcement regarding the firearm. Defendant argues law enforcement came into the residence without a warrant or consent. The Government posits that the contact with law enforcement and the ensuing search of the residence was voluntary and consensual. On May 22, 2017, the Court held an evidentiary hearing on the motion to suppress. The parties filed supplemental briefing following the evidentiary hearing.[1] Having reviewed the evidence and the arguments presented by the parties, the Court is now prepared to rule. As described more fully below, the Court **grants** Defendant's motion to suppress.

## I. Facts

Based on the testimony of the witnesses at the suppression hearing, the Court finds the following facts by a preponderance of the evidence. At around eleven in the morning on November 22, 2016, four Kansas City, Kansas police officers—Sergeant Angela Joyce, Officer

---

[1] Docs. 18, 23.

Dylan Passinese, Officer Mark Wilcox, and Officer Lee— and two Homeland Security Investigation Special Agents—Special Agent Tim Ditter and Special Agent Jason Poniatowski—went to the residence that was the home of Defendant Jose Zuniga-Leija, his mother, Blanca Leija-Hernandez, his five minor-age siblings, as well as the home of Defendant's girlfriend and their two children. The officers went to the residence to conduct a "knock and talk"[2] in hopes of finding Ramon Magallanes-Carta, a member of the Traviesos ("TVS") Hispanic street gang, or Defendant, also a member of the TVS, or someone with information of their whereabouts.

According to testimony, the residence is a small, two-story house, with a simple layout.[3] A porch spans the entire length of the house. Once an occupant enters the front door, the occupant is standing in the living room. The living room has a wide archway opening that leads to the dining room. The living room to the dining room could be described as an open floor plan. To the left of the dining room is a door leading to a bedroom. The dining room also has a stair case leading to the second floor. There is an open doorway in the dining room that leads to the kitchen, which is in the back of the house. Off the kitchen is a doorway leading to the basement.

### A.    Entry to The Residence

In order to conduct the "knock and talk," Ditter, Joyce, and Poniatowski went to the front door of the residence while Lee, Wilcox, and Passinese stood on the perimeter. All of the law enforcement agents wore tactical vests with the word "Police" on them. Ditter, Joyce, and Poniatowski stood on the porch to either side of the door for officer safety. Ditter knocked once using his fist with a normal amount of force. When no one answered, Ditter knocked a second

---

[2] Several of the law enforcement agents testified that "knock and talks" are a commonly used tool for investigation. Special Agent Ditter testified a "knock and talk" is a voluntary contact with law enforcement when there is not enough evidence to obtain a search warrant.

[3] Doc. 18-1. The Government objects to the Court's use of the photographs submitted by Defendant because the photos were not submitted during the evidentiary hearing. The Court considers these photos only in supplementing the testimony of the witnesses regarding the layout of the home. The photos were not used to decide how much space a given room had.

time and the door came ajar and cracked slightly.  After the door became ajar, Ditter announced "Police.  Is anyone in there?"  Joyce, Ditter, and Poniatowski discussed whether to enter the premises for fear it may have been broken into.  Before Joyce, Ditter, and Poniatowski could enter, Defendant's 17-year-old sister Ashley came to answer the door.  Ashley swung the door open the remainder of the way.

### 1. Special Agent Ditter's Testimony

The testimony about the officers' interaction with Ashley once the door was opened varies significantly.  Special Agent Ditter testified that when Ashley swung open the slightly-ajar door, he identified himself as a special agent with Homeland Security and introduced Poniatowski and Joyce.  Ditter showed Ashley his badge and asked her if she understood who he was.  Ashley answered affirmatively.  Ditter indicated that they were conducting an investigation of some illegal activity and asked Ashley for permission to come inside and ask questions.  Ashley consented to the three officers coming inside, and the three officers crossed the threshold of the door and entered the home.  Ditter further testified that because he was unsure that Ashley was over the age of eighteen, he asked for Ashley's date of birth.  Once she said she was seventeen, Ditter asked her if any adults were home.  Ashley replied that her mother, Blanca, was home, in the bedroom.  Ditter testified that he asked Ashley if she could get Blanca from her bedroom.  Ditter heard Sgt. Joyce ask if she could join Ashley to retrieve Blanca.  Ditter testified that throughout this interaction, the officers' tone was polite because they were "basically there as their guest, their consent allowed [him] to be there.  Everything was calm, very cordial, very friendly."[4]  Ditter further testified that he and Poniatowski remained standing in the living room while Joyce and Ashley went to get Blanca.

---

[4] Doc. 19 at 23:15–16.

3

### 2.    Sgt. Joyce's Testimony

Sgt. Joyce corroborated that Special Agent Ditter identified who he was and showed Ashley his badge.  Whereas Ditter testified that he told Ashley they were conducting an investigation, Joyce testified that she asked Ashley if the three officers could enter the residence to step out of the cold and Ashley agreed.  Joyce corroborated that Ditter inquired about Ashley's age, determined that she was underage and asked to speak with her mother.  Joyce also corroborated Ditter's testimony that he asked Ashley to go get her mother from her bedroom and that Joyce asked if she could accompany Ashley to the bedroom.  Joyce further testified that she wanted to accompany Ashley for purposes of officer safety, in case Magallanes-Carta was present, and also to ease the waking mother's mind that officers were in her home.  Joyce also testified that Ashley consented to Joyce going with her, and that Ashley told Joyce that her mother had just given birth.  Joyce further testified she radioed the officers on the perimeter to let them know they were inside.

### 3.    Special Agent Poniatowski's Testimony

Special Agent Poniatowski corroborated that Special Agent Ditter presented his badge and credentials and introduced all three officers, and that one of the officers asked if they could come in and talk, to which Ashley agreed.  Poniatowski also corroborated  that Ditter asked how old Ashley was, and determining that she was seventeen, Ditter asked if anyone else was present.  Ashley stated that her mother was in the first floor bedroom.  Poniatowski further testified that one of the officers asked if they could speak with her mother, and Ashley stated she would get her.  Poniatowski corroborated Joyce and Ditter's testimony that Joyce asked to accompany Ashley to get Blanca, while he and Ditter remained standing in the living room.

### 4. Ashley's Testimony

Ashley testified that after she opened the slightly ajar door the rest of the way, she saw five men and one woman at the door on the porch. She testified that one of the officers asked her name, but that the officers did not show their badges and never asked her age. Yet, Ashley also testified that the officers asked if there was an adult home, she responded that her mother was home, and that she agreed to go get her mother, at the officers' request. Two male officers and one female officer—presumably Sgt. Joyce as the only female present— stepped inside the house to follow her when she turned to walk toward her mother's room. She testified that no one asked her for permission to come inside. She also testified that Sgt. Joyce did not ask her if she could come with her to get Blanca from her bedroom.

### B. Entry to Blanca's Bedroom

Once Sgt. Joyce followed Ashley to Blanca's bedroom, Ashley went into the room to wake her mother who was lying in bed with an infant and a toddler. Blanca was asleep, recovering from a recent Caesarean section, on pain medication, and had a drainage tube in her abdomen. Because the small room was filled with a large bed, Joyce stood just outside the door of the bedroom while Ashley entered the room to awaken Blanca. Blanca woke to Ashley and Joyce, a stranger to Blanca at the time. Joyce explained why the officers were there and asked Blanca if she would agree to talking to the officers in the living room. Blanca, who was in a nightgown, stated that she needed help up from the bed. Joyce and Ashley assisted Blanca out of bed, and Blanca used Joyce's arm and assistance in walking to the living room.

Blanca and Sgt. Joyce both testified that two additional officers— Passinese and Lee— were inside the dining room near the window when Ashley, Joyce, and Blanca walked through

the dining room towards the living room.[5]  Joyce testified the officers had moved to "where if [she] were to yell out and needed help, they were pretty close and would be there in a couple of seconds."[6]  Joyce further testified that no one had asked Ashley for her consent to Passinese and Lee entering the house.  As Blanca, Joyce, and Ashley moved through the dining room to the living room, M.Z., Defendant's 15-year-old sister, came down the stairs.

### C. Consent to Cursory Search

Once in the living room, Blanca, Joyce, Ashley, and M.Z. joined Special Agents Poniatowski and Ditter.  Officers Passinese and Lee remained nearby in the adjacent dining room.  Ditter identified himself and showed his credentials to Blanca.  Ditter asked if there was anyone else in the house, and Blanca stated there was not.  Ditter asked if the officers could conduct a cursory sweep of the residence to search for other people, and Blanca consented.

Passinese and Poniatowski conducted the search, beginning on the first floor, then moving to the second floor and finally to the basement.  In the basement, Poniatowski and Passinese found four individuals—Defendant, Defendant's girlfriend, and their two minor children—lying in bed.  Poniatowski announced that they were law enforcement conducting an investigation and speaking with the other family members upstairs.  Poniatowski asked if they could join the others upstairs, and Defendant agreed and got dressed.  Defendant then walked upstairs with Passinese and Poniatowski.  Defendant was not handcuffed or restrained.

---

[5] Ditter, Passinese, and Poniatowski all testified that Passinese did not enter until later in the encounter when the officers were given permission to conduct a cursory search.  However, the Court finds Joyce and Blanca's testimony credible that Lee and Passinese were in the dining room when Joyce, Blanca, and Ashley left the bedroom because Joyce and Blanca both testified about the two men standing by the dining room windows.  This also comports with Joyce's testimony that as she walked toward Blanca's bedroom with Ashley, she radioed the officers on the perimeter that they were inside the house.  Doc. 19 at 105:6–7 ("I got on the radio and I contacted them, let them know we're inside.  So they came around inside.").

[6] Doc. 19 at 90: 9–10.

### D.     Consent to Search For Guns And Contraband

Once Defendant left the basement and arrived in the living room, he joined Ditter, Joyce, M.Z., Ashley, and Blanca in the living room.  Special Agent Ditter shook Defendant's hand and introduced himself.  Ditter stated that the officers were there because of suspected criminal activities.  At this point, Ditter asked Blanca for consent to search the home for guns, drugs, or other contraband, and she verbally consented.   At this point, Ditter also asked Defendant for consent to search the basement for guns, drugs, or other contraband, and he verbally consented.

Once consent was obtained, Special Agent Ditter and Sgt. Joyce remained in the living room with the family while Special Agent Poniatowski, Officer Passinese, Officer Lee, and Officer Wilcox conducted the search.  In the basement, Passinese found a Glock gun case on a shelf and Poniatowski found a loaded Glock 23 firearm wrapped in a fleece blanket in a baby carrier.  After those items were located, Poniatowski walked upstairs and informed Ditter about the pistol, ammunition in magazines, and gun case found in the basement.

At Special Agent Ditter's request, Defendant consented to talking to Ditter in the kitchen. Once in the kitchen, Ditter read Defendant his rights from a Drug Enforcement Agency rights card.  Defendant indicated he understood his rights, he waived his rights, and agreed to answer questions.  In response to Ditter's questions, Defendant stated that he got the gun for protection from drive-by shootings, he was unlawfully in the United States, he was a member of the TVS gang, and he knew Mallagnes-Carta.  At the conclusion of the interview, Defendant was immediately arrested.

## II.    Discussion

The Court finds it need only address the issue of whether the law enforcement officers received knowing and voluntary consent to initially enter the house from Ashley.  A "knock and

7

talk" is a consensual encounter and does not contravene the Fourth Amendment, even absent reasonable suspicion.[7] As is necessary for a knock and talk, valid consent requires two elements. First, in the case of third-party consent, the third-party "must have [had] actual or apparent authority to do so."[8] Second, the consent must be "freely and voluntarily given. Whether a [party] freely and voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances."[9]

"[A] third party has [actual] authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."[10] A party has apparent authority if "the officer relies on facts that turn out to be wrong or incomplete so long as the officer's belief at the time of the search was reasonable."[11] Ashley had mutual use of the property by virtue of joint access because she testified she lived at the home full time. Thus, Ashley had actual authority to consent to the officers' entry into the residence.

But, the Court finds that Ashley did not consent to the officers' entry into the residence; and even if Ashley consented, officers exceeded the scope of her consent and more importantly, her consent was not voluntarily given. The government must (1) "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given," and (2)

---

[7] *United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013) (citing *United States v. Cruz-Mendez*, 467 F.3d 1260, 1264 (10th Cir. 2006)).

[8] *United States v. Sanchez*, 608 F.3d 685, 689 (10th Cir. 2010) (citing *United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008)).

[9] *Id.* (citing *United States v. Pena*, 143 F.3d 1363, 1365 (10th Cir.1998)).

[10] *Id.* (citing *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir.1999)).

[11] *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (citing *United States v. Romero*, 749 F.3d 900, 905 (10th Cir. 2014)).

the officers must have used no "implied or express duress or coercion."[12] "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."[13] The government bears the burden of proving that consent to enter is given freely and voluntarily.[14] "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."[15] Relevant considerations include:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his Miranda rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.[16]

### A.    The Clarity of Consent to Enter the Residence

The Court finds this case quite similar to *United States v. Miranda-Cortez,* in which the district court suppressed evidence where there was uncertainty related to the issue of consent to enter.[17] There, the officer testified that he asked the defendant "if [he] could step in and speak

---

[12] *Sanchez*, 608 F.3d at 690 (citing *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir.2003) (citation and internal punctuation omitted)).

[13] *United States v. Guerrero*, 472 F.3d 784, 789–90 (10th Cir. 2007).

[14] *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012) (quoting *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011);*Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)).

[15] *Id.* (citing *Harrison*, 639 F.3d at 1278; *Schneckloth*, 42 U.S. at 227).

[16] *Id.* (citing *Harrison*, 639 F.3d at 1278; *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir.2006) (citations omitted)).

[17] *United States v. Miranda-Cortez*, No. 11-0580, 2012 WL 1302600, at *3 (D. Utah Apr. 16, 2012).

with him inside the residence."[18]  The officer further testified that the defendant was "very accommodating . . . and told [the officer] that he was welcome to come inside."[19]  The officer did not testify to the exact words he or the defendant used.[20]  The officer then testified that the defendant responded to his question about coming in by verbally saying "Yes.  He said yes."[21]  The officers then asked the defendant to do a cursory sweep, and he assented.  The district court concluded:

> The problem with this testimony, however, is that there is a significant difference between an occupant expressly telling an officer that "[the officer] was welcome to come inside ... and invit[ing him] in," and the occupant responding "yes" to an officer's statement that may have been understood as a command. The first forecloses the possibility of equivocal consent. The second welcomes uncertainty.[22]

The district court cautioned that "[a] pretext pursued with the stated objective of gaining entrance without a warrant may prematurely lead officers to believe they have succeeded in obtaining sufficient concessions from the home occupant to claim it was consent."[23]  The district court concluded based on "uncertainties and contradictions" and without more specificity, it could not find consent was clear.[24]

Here, there was conflicting testimony about what the officers said to Ashley and when they said it.  Ashley denies giving them consent to enter the house; she testified the officers entered the house without asking for consent to enter and after she turned around to walk to the bedroom to retrieve her mother.  While the officers testified that Ashley gave consent, they offer

---

[18] *Id.* at *2.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* at *6.
[24] *Id.* at *2, 6.

10

conflicting versions of what was said and when consent to enter was obtained. Sgt. Joyce testified that she asked Ashley if the officers could come in and speak because it was cold outside, and Ashley verbally consented. Special Agents Ditter and Poniatowski testified that one of the officers asked if they could come inside and ask questions. Only Ditter testified that he explained to Ashley that they were conducting an investigation. It is thus not clear whether the officers asked for consent and if so, in what context—did they inform Ashley they were there to investigate and seeking consent to enter and investigate; or did they only indicate that they were seeking entry from the cold, so that they could ask her mother for something, presumably consent to remain in the house.

It is also unclear whether the officers asked for Ashley's age and then asked to see her mother, while they were still on the porch, or after they had entered the house. Ashley testified that they never asked for consent to enter and never asked her age, but asked her to go get her mother while the officers were still on the porch. Ashley further testified that the officers entered without her consent, after Ashley turned around to go get her mother. The officers' testimony on when they asked her age, and when they asked her to go get her mother, is not clear. What is clear, however, is that at the time the officers entered the house, they had not obtained consent from Blanca or any other adult there. The Court finds that the lack of "clear and positive" testimony that consent to enter was unequivocal favors constitutional protection against the officers' intrusion.

This scenario is quite different from that in a case the Government relies upon, *United States v. Jones*.[25] There, the Tenth Circuit upheld a denial of a motion to suppress where the defendant never gave oral or written consent for the officers to enter, but turned and began

---

[25] 701 F.3d 1300 (10th Cir. 2012).

11

walking toward the back door of his residence when the officers stated they would like to search.[26] The Tenth Circuit held that the defendant's act of walking toward the back door of the residence, and not inquiring why the officers were following him to the residence were nonverbal actions a reasonable officer would have interpreted as signaling consent to enter rather than refusal of the officers' entry.[27] In *Jones*, there was clear evidence of how consent was obtained; officers stated that they would like to search, the defendant did not respond verbally, but his affirmative acts were such that a reasonable officer would have interpreted such acts as consent to enter.[28]

Here, there is no clear evidence of how or when the officers asked for consent to enter the residence. Special Agents Ditter and Poniatowski testified that one of the officers asked to enter and ask questions. Joyce testified that they asked to enter to get out of the cold and Joyce did not testify that this was prefaced by any statement that they were there to investigate. This inconsistent testimony and lack of clarity on what they communicated to Ashley about their purposes and when they communicated such, is further clouded by a lack of clarity on when they asked Ashley to speak to her mother. Did they ask this while they stood on the porch, as Ashley indicates, or after they were inside? The officers' testimony is equivocal on this point. This lack of clarity causes further ambiguity concerning the meaning of Ashley turning around to go get her mother. If the officers were still on the porch at this point, Ashley's affirmative act of turning around to get her mother could not reasonably be interpreted as permission to enter the house. Unlike the situation in *Jones* there is no clear evidence that at the point Ashley turned

---

[26] *Id.* at 1321.

[27] *Id.*

[28] *Id.*

around to retrieve her mother, the officers had told her they were there to search or to investigate any member of the household.

But, even if Ashley's affirmative act of turning around to get her mother could reasonably be interpreted as consent to enter the house, there is not clear evidence that the scope of any such consent included entry to investigate. Indeed, Ditter's hesitation to talk to Ashley once he determined that she was a minor supports the notion that he realized that Ashley did not have authority to consent to the officers' entry for purposes of investigation, if she gave consent to enter at all. "The standard for measuring the scope of a [person's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and [the person]?"[29] Based on the evidence, would a reasonable person have understood Ashley's action in going to get her mother as consent for the three officers to enter and interrogate members of the household, along with two additional officers who entered the residence while Ashley was in the bedroom? The Court thinks not.

Moreover, even if Ditter had specifically advised Ashley that the officers were there to ask questions about suspected criminal activity, by asking to speak to her mother as soon as he determined Ashley was a minor, is indicative that the officers understood that it was Blanca, not Ashley, who had control of the premises and could consent to an interrogation and/or search of the residence. In short, there is no clear and positive testimony that Ashley gave consent to enter at all; nor is there clear and positive testimony that Ashley gave consent for the officers to enter for even the limited purpose of the officers getting out of the cold while she went to get her mother. And, even the officers' actions in asking to speak to Ashley's mother, belies the

---

[29] *United States v. Mendoza*, 817 F.3d 695, 700 (10th Cir. 2016) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

13

Government's argument that Ashley gave full consent to enter and perform investigative activities.

### B. Voluntariness of Ashley's Consent

Moreover, even if the Court found that Ashley gave unequivocal and unlimited consent to for the officers to enter, the Court finds that Ashley's consent was not voluntary and freely given under the totality of the circumstances. It is undisputed that the officers did not physically mistreat Ashley or use violence, threats, promises, inducements, deception, trickery, or an aggressive tone at the door. It is also undisputed that the officers did not display police weapons. But other considerations justify finding that any consent by Ashley was involuntary.

While Ashley's age is not a bar to consent, it is a consideration when determining the voluntariness of consent assuming it was even given. The Tenth Circuit suggests no per se rule against a minor's consenting to entry onto private property.[30] Rather, "age is but one factor within the totality of the circumstances [the court] consider[s] when determining whether consent was voluntary."[31] For example, in *United States v. Sanchez*, the Tenth Circuit upheld a 15-year-old minor's consent for police to enter the defendant's home.[32] The district court found the minor was a relatively sophisticated teenager, she was routinely in charge of the family's house, she appeared calm and mature, she agreed without reservation to conduct a tour, and she was familiar with the parole officer who asked for consent.[33]

Here, there are some facts that weigh in favor of a finding that Ashley was a relatively sophisticated teenager. At the relevant time she was seventeen. Further, she exhibited a calm

---

[30] *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010).

[31] *Id.* (citing *United States v. Gutierrez–Hermosillo*, 142 F.3d 1225, 1231 (10th Cir.1998)).

[32] *Id.*

[33] *Id.*

demeanor while testifying at the suppression hearing.  On the other hand, Ashley is a high school dropout, and unlike the teenager in *Sanchez*, she had no familiarity nor prior interaction with the law enforcement officers.  In fact, Blanca and Sgt. Joyce testified that law enforcement had visited the residence on prior occasions, but always in the capacity of *protecting* its residents, who were victimized on multiple occasions by drive-by shootings directed at the house.[34]  Neither Blanca nor Ashley had interacted with officers in the context of officers investigating a member of their household.  In fact, unlike in *Sanchez*, Ashley had had no prior interaction with these law enforcement officers.   These facts distinguish this situation from *Sanchez*.

Moreover, while the officers testified that they were there as "invited guests," there are many facts that weigh in favor of a finding that if Ashley consented, it was involuntary.  Ashley and M.Z. testified that one of the officers stated that they should not move around the house because he did not want to have to shoot; and that Sgt. Joyce acted surprised by the officer's statement.  But, other than this testimony there is no evidence that they officers' tone and conduct was intentionally threatening or forceful.

Yet, in considering the totality of facts, the Court must consider that within minutes of Ashley going to the bedroom to get her mother, at least five officers had entered and were on the main floor of this small house—two officers were in the living room, two officers were in the adjacent dining room and Sgt. Joyce was in the doorway of Blanca's small bedroom.  All of the officers were uniformed and in tactical vests.  None of the other officers ever told Ashley that she could refuse their entry into the house, or refuse Sgt. Joyce's request to accompany her to the bedroom.[35]  Furthermore, at the time Ashley answered the slightly ajar front door, to find at least

---

[34] Doc. 20 at 49–50.

[35] *United States v. Harrison*, 639 F.3d 1273, 1279 (10th Cir. 2011) ("Although government agents are not required to advise a defendant that he or she has a right to refuse consent to search, this is one factor considered in the totality of circumstances.").

three officers standing on the front porch,[36] Ashley had been sleeping, had awoken to the knocking on the door, and answered the door alone, in this, a non-public, private space.[37] These circumstances weigh in favor of a finding that Ashley was in a coercive environment and that to the extent she gave consent, it was not voluntary.

        **C.**       **Voluntariness of Blanca's Consent**

Alternatively, even if the Court assumes that Ashley gave voluntary consent for the officers to enter, the Court finds Blanca's consent to the officers remaining in the residence was not voluntary. While there was no evidence of threats or physical contact between Blanca and the officers, there are a number of considerations making consent involuntary. Blanca woke up in her small bedroom to Ashley and Sgt. Joyce. Blanca had just undergone a Cesarean section, and she was on pain medication and had a drainage tube attached to her body. She was sleeping with her newborn child and a toddler, whom she did not want to wake. She could not walk to the living room unassisted; Sgt. Joyce and Ashley had to help her get out of bed and walk to the living room.

Moreover, as Joyce and Ashley walked Blanca to the living room, two more officers—Passinese and Lee—stood in the dining room, and Ditter and Paniatowski stood in the living room of this small house. Thus, when Blanca entered the living room, there were at least five officers in various places in this small residence. It is undisputed that Joyce explained to her why the officers were there and asked her to come to the living room for questioning. It is undisputed that when she arrived in the living room, Ditter displayed his badge and told her that the officers were there conducting an investigation regarding criminal activity in the house. But

---

[36] Ashley testified that there were six officers on the porch when she went to the door.

[37] *United States v. Rogers*, 556 F.3d 1130, 1137 (10th Cir. 2009) (considering also the presence of several officers, interaction in a small, enclosed, or non-public place, and the absence of other members of the public when considering whether an encounter was consensual).

16

there is no evidence that any of the officers ever advised Blanca that she could refuse to allow them to remain in the house, or refuse to answer their questions, or refuse Ditter's request to perform a cursory sweep, or refuse Ditter's request to search the house.  Further, the fact that Ditter immediately informed Blanca that there was suspected criminal activity in the home certainly cuts against her believing that the contact was voluntary and she could ask the officers to leave or refuse to answer questions.[38]  Thus, even if the Court found Ashley's consent for the officers to enter voluntary, the Court finds Blanca's consent for the officers to remain in the home involuntary under the totality of the circumstances.

### D. Fruit of the Poisonous Tree

Lastly, the Court considers whether the unlawfully obtained consent rendered Blanca's and Defendant's consent to search the home invalid and the subsequently discovered evidence and obtained statement inadmissible.  If consent follows after a Fourth Amendment violation, the Government "must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent."[39]  In *Brown v. Illinois*, the Supreme Court articulated three factors especially relevant to this inquiry: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct."[40]

In this case there was a close temporal proximity between the initial entry into the home and the consent to search.  Ditter's testimony suggested that the time elapsing from entry to

---

[38] *United States v. Jones*, 701 F.3d 1300, 1314 (10th Cir. 2012) (considering whether "a reasonable person would have been so cowed by such an accusatory assertion that he would have believed that he was not free to discontinue the encounter and go about his business.").

[39] *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010) (quoting *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996)).

[40] *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

17

consent to search was as little as fourteen minutes. Second, there was no intervening circumstance that removed the taint of the prior illegality.[41] There was no evidence that, for example, the officers explained to Blanca or Defendant that they had the right to withhold consent to search.[42] Third, there was evidence that the misconduct was purposeful and flagrant as outlined in great detail above. The Court concludes the Government failed to meet its heavy burden of establishing that Blanca's and Defendant's consent was purged of the taint of the involuntary consent obtained to enter the residence.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress (Doc. 14) is **granted**.

**IT IS SO ORDERED.**

Dated: July 28, 2017

S/ Julie A. Robinson  
JULIE A. ROBINSON  
UNITED STATES DISTRICT JUDGE

---

[41] *Fox*, 600 F.3d at 1261 ("'The facts or events must create a discontinuity between the illegal [seizure] and the consent such that the original illegality is weakened and attenuated.'" ) (citing *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 2010)).

[42] *Id.* (citing examples of intervening circumstances to include explaining a consent form and advising an individual of the right to withhold consent or release from custody, an appearance before a magistrate, or consultation with an attorney) (citations omitted).